UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
:
BARBARA J. FRIED et. al.                 :
:
                    Plaintiffs,          :
:                USDC SDNY
:                DOCUMENT
:                ELECTRONICALLY FILED
:                DOC #:
:                DATE FILED: 3/29/11
:
:                09 Civ. 9100(BSJ)
:                10 Civ. 4299(BSJ)
                    v.                   :
:                **Memorandum & Order**
LEHMAN BROTHERS REAL ESTATE              :
ASSOCIATES III, L.P. et. al.,            :
:
                    Defendants.          :
------------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

    Plaintiffs Barbara J. Fried et. al. ("Plaintiffs") filed
the above-captioned action on October 30, 2009 against
Defendants Lehman Brothers Real Estate Associates III, L.P. et.
al. ("Defendants").  Plaintiffs name five Lehman entities as
defendants: Lehman Brothers Real Estate Associates III L.P.;
Lehman Brothers Private Equity Advisers LLC; Real Estate Private
Equity, Inc.; LegacyCo Advisor; and ManageCo.  Plaintiffs also
name ten individual defendants: Mark A. Walsh, Brett Bossung,
Mark H. Newman, Michael J. Odrich, Christopher M. O'Meara,
Richard S. Fuld, Jr., Joseph M. Gregory, Erin Callan, Ian
Lowitt, and Thomas Russo.

    On July 14, 2010, Plaintiffs filed their Second Amended
Complaint alleging eleven causes of action against Defendants,
including: securities fraud under section 10(b) of the 1934

Securities Exchange Act; rescission under the 1934 Securities Exchange Act; violation of Section 20 of the 1934 Securities Exchange by the ten individual defendants; breaches of fiduciary duty under New York and Delaware law; violation of the Delaware Securities Anti-Fraud Statute; fraudulent misrepresentation under New York law; concealment under New York law; willful breach of the covenant of good faith and fair dealing; aiding and abetting fraud violations against all the individual defendants; fraud and breach of contract under New York law against individual defendants Walsh, Bossung, Newman, as well as the General Partner, Investment Advisor, REPE LegacyCo Advisor, and ManageCo; and declaratory relief concerning management fees against General Partner, Investment Manager, REPE, Walsh, Bossung, Newman, LegacyCo Advisor, and Manage Co.

Defendants now move to dismiss all claims on the grounds that Plaintiffs have failed to state a claim upon which relief may be granted.  See Fed. R. Civ. P. 12(b)(6).  For the reasons stated below, Defendants' Motion to Dismiss is GRANTED.

### BACKGROUND[1]

---

[1]  All facts are drawn from the allegations in the Second Amended Complaint. These facts are assumed to be true only for the purposes of the instant Motion to Dismiss.  The Court has also considered a number of documents that were either attached to, referenced in, or integral to Plaintiffs' allegations.  This includes two documents that were central to the LBREP III Transactions: first, the Private Placement Memorandum ("PPM"), which explained the LBREP III investment strategy, management structure, and potential risks, (Second Polkes Decl., Ex. 1); and second, the Limited Partnership Agreement ("LPA") which essentially served as the contract

### Overview of the Formation of the LBREP III Partnerships

The 67 Plaintiffs in this action are each limited partners in one of four Delaware partnerships, Lehman Brothers Real Estate Partners III, L.P., Lehman brothers Real Estate Fund III, L.P., Lehman Brothers Offshore Real Estate Fund III, and Lehman Brothers Real Estate Capital Partners III. These four partnerships (referred to collectively as the "LBREP III Partnerships" or the "Partnerships") were formed on June 25, 2007. (Comp. ¶ 42.) Defendant Lehman Brothers Real Estate Associates III ("LBREA III") is the General Partner of each of the Partnerships. (Compl. ¶ 15.) The Complaint also names ten Lehman executives as individual defendants.

The Partnerships were formed for the purpose of creating an investment vehicle for commercial real estate assets. (Compl. ¶ 43.) Using a "disciplined investment process" and benefiting from their access to Lehman's "deal flow," the LBREP III Partnerships sought to invest in "meaningful pockets of opportunity . . . in local real estate markets." (Second Polkes Decl. Ex. 1 at 1-8.) LBREP III was the third such partnership created by Lehman Brothers. LBREP I and LBREP II, founded in 2000 and 2004 respectively, had a "proven record of success"

---

binding the Partnerships and investors, setting out all material terms for
the investors and management. (Second Polkes Decl. Ex. 3.)

seeking out "strategic investments in real estate markets in the U.S., Europe, and Asia."  (Id.)

Lehman began considering investment opportunities for LBREP III even before the Partnerships were officially formed on June 25, 2007.  (Compl. ¶ 42, 44.)  Commercial real estate properties were examined and purchased by Lehman for LBREP III throughout 2007, "many [for prices] near the top of the market not long before the commercial real estate market began a steep decline." (Compl. ¶ 44.)

As part of the marketing of LBREP III, in October 2007 the Partnerships issued a Private Placement Memoranda ("PPM") to provide information for prospective investors.  The PPM outlined the Partnerships' intended investment strategy, the process for selecting investments, and Partnership management structure. (Compl. ¶ 46; Second Polkes Decl. Ex. 1.)

In November 2007, the Partnerships issued the first supplement to the PPM ("Supplement One").  This document listed 29 possible partnership investments (all commercial real estate properties) under consideration or already purchased by Lehman, as described above.  Basic details were provided for each property, including the expected total investment, amount invested by Lehman to date, details regarding the nature of the property, whether other entities would serve as partners in the

venture, and other relevant information.   (Parker Decl., Ex. Q.)
These properties will be referred to as the "warehoused
properties."

Supplement One specifically disclosed that any listed
property eventually transferred to the Partnerships from Lehman
would be for the "acquisition cost plus Lehman Brothers' cost of
carry, not to exceed 9% per annum." (Compl. ¶ 5.)   The document
also disclosed additional information regarding "Risk Factors
and Potential Conflicts of Interest."   The new section explained
that recent events in the sub-prime mortgage market and other
areas of the economy caused "significant dislocations,
illiquidity, and volatility" in global markets.   The document
mentioned that this market change could cause a weakening of
economies in the United States and abroad, and could have
negative effects on LBREP III's investment strategy, including
the loss of "invested capital and anticipated profits."   (Parker
Decl., Ex. Q.)   Thus, information regarding the "warehoused
properties" targeted for transfer to LBREP III, as well
information regarding changes in market conditions, was
available to investors prior to making any investment decision.

Most of the Plaintiffs signed Subscription Agreements in
October and November 2007, collectively committing to invest

more than $53 million into the Partnerships.[2]   (Compl. ¶ 45.)
These Plaintiffs were officially admitted as limited partners on
November 30, 2007.  (Compl. ¶ 7.)  Some Plaintiffs signed
Subscription Agreements in January and February 2008 and were
admitted as limited partners shortly thereafter.  (Compl. ¶ 7.)
The capital commitments of the Plaintiffs were "expressly made
irrevocable by the Subscription Agreements."  (Compl. ¶ 7.)

By May 8, 2008, all Plaintiffs had signed Subscription
Agreements, been admitted as Limited Partners, and paid the
"capital calls" (cash contributions) to LBREP III.  (Compl. ¶
63.)  On that date, the General Partner issued the fifth PPM
Supplement ("Supplement Five"), informing the limited partners
that it planned to transfer 26 of the warehoused real estate
investments to the Partnerships, "almost all [of which] had been
previously listed in supplements [to the PPM] ... as mere
possibilities."  (Compl. ¶ 63.)  The transactions were approved
pursuant to Section 6.13 of the Limited Partnership Agreement,
which specified that "consent [for a transaction] would be
deemed to have been given if the transaction were disclosed
before the investor is admitted as a limited partner."  (Compl.
¶ 78.)

---

[2] The Subscription Agreement, signed by the investor and a representative of
the Partnerships, formally bound both parties to the transaction and admitted
an investor as a Limited Partner to LBREP III.  (See Parker Decl., Ex. I.)

"From mid-2007 through 2008," the commercial real estate market and global economy declined substantially. (Compl. ¶ 2.) As has been well documented by the media, this decline, as well as other factors, caused Lehman Brothers Holdings Inc. to announce major losses in June 2008 and ultimately declare bankruptcy on September 15, 2008. (Compl. ¶ 2.)

On December 5, 2008, the LBREP III Partnerships issued unaudited financial statements for the Third Quarter of 2008. These statements reflected a markdown of approximately 27% of the value of the LBREP III holdings. Further losses were reported in the 2008 Annual Report and the First Quarter 2009 report. (Pl. Br. at 15.)

## Plaintiffs' Allegations[3]

The core of Plaintiff's case is the allegation that Lehman omitted material information regarding the LBREP III Partnerships from the PPM, supplements to the PPM, and the LPA. They allege that Defendants knew and failed to disclose that upon transfer of the warehoused properties, the limited partners would immediately sustain major losses to the value of their holdings because the properties had lost significant value since their acquisition by Lehman. (Pl. Br. at 2.)

---

[3] As discussed at oral argument, Plaintiffs' opposition brief presents a significantly narrowed set of issues as compared to the Second Amended Complaint. This Court has considered all of Plaintiffs' arguments, but has focused on the arguments and theories emphasized in the opposition brief.

According to Plaintiffs, Defendants engaged in these material omissions and misrepresentations to "conceal [Lehman's] virtual insolvency long before its bankruptcy on September 15, 2008." (Compl. ¶ 2.)  Plaintiffs theorize that this virtual insolvency stemmed from Lehman's decision in mid to late 2007 to "double down" and increase its exposure in commercial real estate, and then to change course in November 2007 and decide to dramatically reduce its risk exposure in commercial real estate. (Compl. ¶ 6.)  Lehman began marking down its own commercial real estate holdings as early as November 2007, while leaving the LBREP III properties without any adjustment to their valuation until after the transfer had been completed.  (Pl.'s Br. at 4.) On May 31, 2008, Lehman's quarterly report filed with the SEC disclosed that it had sustained a quarterly loss of $2.8 billion, including $600 million in real estate markdowns since November 2007.  (Pl. Br. at 13-14.)  No adjustments were made to the valuation of the LBREP III properties until September 2008. (Compl. ¶ 66.)

Plaintiffs' Second Amended Complaint contains four main allegations to sustain their claims for securities fraud. First, the Second Amended Complaint identifies 39 statements in the PPMs regarding the investment process, strategy, and approval process for prospective investments that were allegedly

misleading.  According to Plaintiffs, these statements failed
"to state that the Lehman properties to be transferred to LBREP
III had already been purchased, at substantially higher prices
. . . result[ing] in substantial losses" for the limited
partners.  (Pl. Br. at 8.)   In this regard, Plaintiffs contend
that Lehman's decision to "mark to market" its own commercial
real estate holdings during the same time period demonstrates
that Defendants knew or should have known that write-downs to
the warehoused properties were also warranted.   (Pl. Br. at 13.)

Second, Plaintiffs allege that Defendants knew they would
not form an Investor Advisory Committee to represent the
interests of the limited partners, as promised in the PPM and
LPA.  (Compl. ¶ 50.)

Third, Defendants allegedly knew and failed to disclose
that the acquired properties carried substantial debt,
obligating the Partnerships to take on $1.131 billion of the
debt, due by 2013.  (Compl. ¶ 53(h).)

Fourth, Plaintiffs allege that Defendants knew and failed
to disclose $157 million in additional acquisition costs
incurred by Lehman while acquiring the properties and passed
these costs on to the Partnerships. (Compl. ¶ 53(e).)

Essentially, Plaintiffs allege that taken together,
Defendants' omissions and misrepresentations were designed to

"conceal the risk that Defendants would use the Partnerships as a vehicle to dispose of overvalued assets to minimize overall losses to Lehman, [and] failed to state the risk that Defendants would indeed place Lehman's interests above those of the Partnerships."  (Compl. ¶ 54.)

### Allegations against Individual Defendants

Plaintiffs' suit names ten individual Defendants.  Five of these Defendants (Michael Odrich, Mark Walsh, Brett Bossung, Mark Newman, and Christopher O'Meara) were members of the Lehman Investment Committee that reviewed and approved Lehman investments.  Plaintiffs allege that these five individuals "knew or had access to the omitted facts that were later published in 2008 and 2009 financials" and knew or had access to facts demonstrating that Lehman's public statements were not accurate.  (Pl. Br. at 17.)

Plaintiffs also name Richard Fuld, Lehman's Chief Executive Officer, alleging that he knew of the need to write down the LBREP III properties or warn prospective investors of the losses they were likely to incur.  (Pl. Br. at 18.)

Additionally, Defendant Joseph Gregory, Lehman's President and Chief Operating Officer, allegedly "knew the 2007-08 real estate market was deflating" and therefore knew that LBREP III

investors "ran a real risk of suffering a substantial loss" upon transfer of the properties.  (Pl. Br. at 19.)

Further, Plaintiffs name Lehman's three Chief Financial Officers during the time period in question, Christopher O'Meara (already mentioned as a member of the Lehman Investment Committee), Erin Callan, and Ian Lowitt.  O'Meara, CFO until December 1, 2007, received underwriting documents for the LBREP III properties and possessed "certain knowledge of the growing risks in real estate markets . . . making him 'reckless' to fail to recognize that the PPMs omitted material information of coming losses." (Pl. Br. at 19.)  Erin Callan, CFO from December 1, 2007 to June 12, 2008, reportedly knew that Lehman "began to curtail its risk profile in commercial real estate in November 2007."  Callan "had access to information suggesting that the PPMs were misleading without the omitted information." Finally, Lowitt, who became CFO on June 12, 2008, oversaw the LBREP III financial statements for the second quarter of 2008, which allegedly omitted material information regarding losses to the Partnerships.  Plaintiffs asserts that this is "in itself circumstantial evidence of guilty knowledge."  Like his predecessors, Lowitt also had access to financial information regarding the eventual losses to the Partnerships.  (Pl. Br. at 19-20.)

Finally, Plaintiffs allege that Thomas Russo, Lehman's Chief Legal Officer, "had chief legal responsibility to assure that securities prospectuses be published without misstatements or omissions . . . including the obligation to disclose all material facts to investors." (Pl. Br. at 20-21.)

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief may be granted. A plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1940 (2009).

Additionally, Plaintiffs must satisfy the heightened pleading standard under both rule 9(b) of the Federal Rules of Civil Procedure and under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Under rule 9(b), the complaint must state the circumstances constituting fraud "with particularity." Fed.R.Civ.P. 9(b). Under the PSLRA, a securities fraud complaint must: (1) specify the misleading statements, (2) identify the speaker, (3) state where and when

the statements were made, and (4) explain why the statements were fraudulent.  ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  Additionally, the PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

## LEGAL ANALYSIS

### 1.  10(b) and Rule 10b-5 Claims against all Defendants

#### Legal Standard

To state a claim under Section 10(b) of the 1934 Securities and Exchange Act and under Rule 10b-5, Plaintiffs must allege that Defendants: (1) made a material misstatement or omission; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) which Plaintiffs reasonably relied upon; and (5) that this reliance was the proximate cause of Plaintiff's economic loss.  Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007).

#### Analysis

##### a.  Relevant Date for 10(b) Analysis

As a preliminary matter, the parties dispute the relevant date of the investor's commitment for the purpose of analyzing Plaintiffs' securities fraud claims.  The relevant time period

for analyzing liability for securities fraud is the time of the sale of the security.  Securities are considered sold when the parties "are obligated to execute the transaction." Westinghouse Electric Corp. v. '21' International Holdings, Inc., 821 F. Supp. 212, 215 (S.D.N.Y. 1993)(citing Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 891 (2d Cir. 1972)). This is significant because the Second Circuit has stated that "for the purposes of § 10(b) and rule 10b-5, the 'materiality of the information misstated or withheld is determined in light of what the defendants knew at the time the plaintiff committed himself [to the transaction]." Castellano v. Young and Rubicam, Inc., 257 F.3d 171, 181 (2d Cir. 2001).

Plaintiffs argued at oral argument that Defendants' duty to disclose did not cease with the November 30, 2007 closing, but continued until the last supplement to the PPM was issued on May 10, 2008.  (Oral Argument Tr., 20-21.)  Defendants counter that most plaintiffs were irrevocably committed when they signed the Subscription Agreement and were admitted as limited partners on November 30, 2007.  Therefore, Defendants argue that the relevant date for the analysis under § 10(b) is November 30, 2007.

In this case, Plaintiffs were irrevocably committed to investment in LBREP III Partnerships upon their signing of the

14

Subscription Agreement.  The Complaint states that in November 2007:

> [M]ost of the Plaintiffs received the PPMs and signed
> Subscription Agreements, thereby committing to invest
> their full Capital Commitment in the Partnerships.  On
> November 30, 2007, they were admitted as limited
> partners.  Some of the Plaintiffs signed Subscription
> Agreements in January and February of 2008 and were
> admitted shortly thereafter. . . . Plaintiffs' Capital
> Commitments were expressly made *irrevocable* by the
> Subscription Agreements, so investors were indeed
> wholly dependent on Defendants to abide by the PPM's
> promise to seek "risk-adjusted returns."

(Compl. ¶¶ 6-7, emphasis in original.)  Accordingly, the

analysis under § 10(b) and rule 10b-5 focuses on what Defendants

knew as of the date of signing of the Subscription Agreements.

For most plaintiffs, the relevant date is November 30, 2007.

Plaintiffs fail to specify how many Plaintiffs committed after

that date.  For the purposes of this motion, the Court will

assume based on the allegations in the Complaint quoted above

that all Plaintiffs had signed Subscription Agreements and been

admitted as limited partners on or before March 1, 2008.

b.   **Knowing or Reckless Misrepresentations and Omissions
     Regarding the Value of the Warehoused Properties**

     As described above, Plaintiffs allege that Defendants made

39 misleading statements in the PPM and LPA, see Pl. Br. at 2

n.1, describing the investment process, oversight, and

management of the LBREP III Partnerships while omitting that the

investors would suffer substantial losses upon transfer of the

properties bought by Lehman.  (Pl. Br. at 6.)  They further
allege that Defendants made such omissions with a reckless state
of mind, fulfilling the scienter requirement for a 10(b) and
10b-5 claim.

To satisfy the scienter requirement, Plaintiffs must allege
facts that "constituted strong circumstantial evidence of
conscious misbehavior or recklessness on the part of
defendants." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).
In this context, recklessness is defined as "conduct which is
highly unreasonable and reflects an extreme departure from the
ordinary standard of care ... to the extent that the danger was
either known to the defendant or so obvious that the defendant
must have been aware of it." Id., internal citations and
quotations omitted.

Specifically, Plaintiffs allege the following facts to
support their assertion that Defendants were reckless in issuing
the PPMs and LPA.  First, Plaintiffs assert that Lehman greatly
expanded its real estate holdings in 2007, "from $9.4 billion as
of November 2006 to over $21.9 billion at November 2007." (Pl.
Br. at 12.)  Then, beginning in November 2007, Lehman began to
reduce its risk exposure in commercial real estate and take
write downs on its commercial real estate holdings.  In support
of this statement, Plaintiffs cite the report of the Bankruptcy

16

Court Examiner.   The Report detailed that in a November 2007
presentation to Lehman CEO Richard Fuld, the commercial real
estate group recommended reducing its balance sheet by $15
billion.   During the "December 2007 Holiday Season," Fuld
decided to "pursue an aggressive reduction of Lehman's risk
profile."  (Parker Decl., Ex K, Report of Anton R. Valukas,
Examiner In re Lehman Brothers Holdings Inc., at 158.)   However,
Lehman did not actually begin pursuing reductions until March
2008.  (Parker Decl., Ex. K at 158-59.)   Overall, Lehman
ultimately took more than $3 billion in write-downs in
commercial real estate over the course of 2008, with
$488,000,000 of those write-downs in occurring in the first and
second quarters of 2008.  (Parker Decl., Ex. K at 228.)

     Plaintiffs argue that these facts show that Lehman knew or
should have known when they issued the first PPM, the five PPM
supplements, and the LPA that the LBREP III-designated
properties had lost significant value prior to the May 28, 2008
transfer.  As Lehman was considering taking significant write-
downs on its own commercial real estate holdings, it was
reckless in failing to disclose the risk that substantial write-
downs might also be warranted for the LBREP III properties.

     Defendants counter that Plaintiffs have not identified any
fact or document demonstrating that Defendants knew or had

reason to know that the LBREP III properties would sustain
losses.  Nor, according to Defendants, can Plaintiffs show that
any losses had actually been sustained by the properties as of
the first closing date, November 30, 2007.  Rather, Defendants
argue that the documents and statements relied on by Plaintiffs
demonstrate that at some point in 2008 Lehman determined that
write-downs to its own commercial real estate portfolio were
appropriate.  However, Defendants argue that these documents do
not demonstrate that they knew or should have foreseen the
losses to the warehoused LBREP III properties as of November 30,
2007.  Defendants also maintain that they disclosed all material
information to investors in the LPA, PPM, and PPM Supplements.

     The Court finds that, even using March 1, 2008 as the
relevant date for the 10(b) analysis, Plaintiffs have failed to
allege facts with sufficient particularity to support the
allegation that Defendants knew or should have known by this
date that the transfer of the LBREP III properties would cause
the LBREP III Partnerships to sustain a major loss.

     First, Plaintiffs fail to plead facts supporting an
inference of scienter with the specificity required under the
PSLRA.  Plaintiffs rely heavily on the fact that Lehman marked-
to-market a portion of its commercial real estate holdings in
the First and Second Quarters of 2008.  However, they cannot

allege specific facts to support their allegation that these
markdowns demonstrate scienter as to the LBREP III properties.
General knowledge about market conditions or trends "does not
equate to harboring a mental state to deceive, manipulate, or
defraud." Plumbers & Steamfitters Local 773 Pension Fund v.
Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 300
(S.D.N.Y. 2010)(citing In re PXRE Group, Ltd., Sec. Litig., 600
F. Supp. 2d 510, 540 (S.D.N.Y. 2009)). Although Plaintiffs
allege that Lehman had special expertise that gave them superior
knowledge about the future of the commercial real estate market
(see Compl. ¶¶ 46, 53(a)-(t), 65), they have failed to plead
facts with particularity to support this assertion. Plaintiffs
have alleged no facts indicating that Defendants knew or should
have known of any losses to the LBREP III properties as of March
2008. Mere observations about trends in the commercial real
estate market generally, such as those highlighted in the
Maltzman declaration, do not support Plaintiffs' allegation that
Defendants should have known that the LBREP III warehoused
properties had decreased in value as of March 1, 2008.[4]

   Further, Defendants made substantial disclosures to
prospective investors regarding the targeted properties. As

---

[4] The Maltzman Declaration, relied on in the Second Amended Complaint and
Plaintiffs' opposition brief, attempts to provide quantitative analysis in
support of their claims. It is worth mentioning that Richard Maltzman,
author of the document, is also a Plaintiff in this action.

described above, Supplement One to the PPM, issued before any
Plaintiff committed to invest in LBREP III, gave substantial
details regarding every property under consideration at that
time.  For each investment opportunity, the document described
the expected total investment, money invested to date, and plans
for future development, as well as important details regarding
the property's intended use, location, and business plan.
Additionally, that document also described changes happening in
the market during the fall of 2007 that could affect LBREP III
investments.  (See, supra, pp. 4-5.)  Thus, Plaintiffs had
information regarding most of the LBREP properties prior to
investing and could have engaged in their own investigation to
determine whether the properties were likely to gain or lose
value relative to the Lehman purchase price.  Plaintiffs also
had information about market risks specific to the fall of 2007,
the time period when Plaintiffs were deciding whether to invest
in LBREP III.  Where the allegedly omitted facts are disclosed
to the market, there can be no omission for the purposes of a
securities fraud claim.  In re Progress Energy, Inc., 371 F.
Supp. 2d 548, 552 (S.D.N.Y. 2005).  A prospective investor in
early 2008 would have had access to substantial information
regarding the warehoused properties and the state of the market

generally, undermining Plaintiffs' claims that they were misled regarding the true values of the properties.

Lastly, Plaintiffs attempt to demonstrate scienter by showing that Defendants intentionally concealed and misstated the fair market values of the warehoused properties during the spring of 2008.  Plaintiffs contend that these manipulations prove that Defendants knew they were concealing material information regarding the decreasing values of the warehoused properties.  Plaintiffs point first to Defendants' failure to issue financial statements for the second quarter of 2008 as evidence of scienter.  However, this allegation cannot support a claim of securities fraud because this occurred after the March 1, 2008 commitment date relevant to this analysis.

Plaintiffs then point to internal Lehman documents prepared in 2008 that show that the value of LBREP III's portfolio increased 2.4 percent as of June 30, 2008.  (Pl. Br. at 14.)  While Plaintiffs do not entirely explain how this document bolsters their claims, they seem to allege that these gains were knowingly inflated by Defendants through a manipulation of the discount rate used to estimate the current value of a property.  However, Plaintiffs calculations do not demonstrate that the discount rates were actually adjusted to increase the values of the properties, let alone that Defendants did so knowingly for

21

the purpose of hiding LBREP III losses.[5]  In fact, Plaintiffs'
reference to this internal (and at the time confidential) Lehman
document actually undermines their claim, as it provides
evidence that Lehman believed the properties had gained value
through the second quarter of 2008.  As Plaintiff cannot
plausibly allege facts that contradict these valuations,
Plaintiffs' attempt to establish scienter by this means fails.

Consequently, Plaintiffs have not met the pleading
standards of the PSLRA, as they have not alleged facts with
particularity to demonstrate that Defendants knew or should have
known that the LBREP III properties had sustained losses as of
March 1, 2008.

c.  **Failure to Establish the Investment Advisory Committee**

Plaintiffs also argue that Defendants failed to create an
Investment Advisory Committee as promised in the PPM and LPA.
This group was supposed to "advise the General Partner with
respect to potential conflicts of interest" and to consult with
the General Partner regarding "valuations for the purposes of
determining write-downs of investments, if any."  (Compl. ¶ 81.)

---

[5] Plaintiffs include a chart entitled "Discount Rate Analysis" on page 14 of
their opposition brief, listing the discount rates applied in the last
quarter of 2007 and the first three quarters of 2008 for eight different
properties.  But, Plaintiffs' chart does not provide persuasive evidence that
Defendants consciously manipulated the discount rate to defraud investors.
During the relevant time period for this analysis (Fourth Quarter 2007 to
First Quarter 2008), the discount rate increased for two of the properties,
decreased for two of the properties, stayed the same for two properties.
This does not support Plaintiffs' theory that Defendants knowingly decreased
discount rates to show a profit rather than a loss.

The materials provided to investors did not specify a date by which the IAC would be formed.  (Second Polkes Decl. Ex. 1 at 27; Ex. 3 at 53-55.)

Plaintiffs contend that because Defendants never intended to create an IAC, this failure constitutes a misrepresentation under § 10(b) and rule 10b-5.  In support of this claim, Plaintiffs rely on the fact that no IAC had been created as of the dates of transfers of the warehoused properties to the LBREP III Partnerships and also mention unspecified facts acquired by "access to confidential information."  (Compl. ¶¶ 81-82.)

This claim lacks the factual allegations required to withstand a motion to dismiss.  As the Plaintiffs did not identify or describe the facts obtained by their "access to confidential information," the only factual allegation underlying this assertion is that no IAC was formed. Allegations based merely on "fraud by hindsight" are insufficient as a matter of law under § 10(b) and rule 10b-5. Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978).  The mere fact that no IAC was ever formed cannot sustain a claim that this failure constituted a knowing misrepresentation to induce Plaintiffs to invest.  Plaintiffs cannot point to any actual

facts underlying their belief that Defendants knew or should
have known upon issuing the LPA that it would not form the IAC.[6]

Therefore, as Plaintiffs has not alleged any fact
demonstrating that Defendants knowingly failed to create the
IAC, this allegation does not support a claim for securities
fraud under § 10(b) or Rule 10b-5.

**d.   Failure to Disclose Debt/Leverage**

Additionally, Plaintiffs allege that Defendants failed to
disclose "$2.702 billion of short-term indebtedness associated
with the properties that LBREP III had acquired" until late
2009.  (Compl. ¶ 73.)  Of this amount, the Partnerships were
responsible for $1.242 billion, payable by 2013.  (Compl. ¶
53(e).)  Defendants counter that the use of leverage (or debt)
was disclosed in the PPMs issued prior to the first closing on
November 30, 2007.

The Court agrees with Defendants that the use of debt at
all stages in the investment process was repeatedly disclosed to
prospective investors.  A review of the PPMs and LPA demonstrate
that Defendants described in detail the role leverage would play

---

[6] The PPM and LPA also specifically disclose that the intended role of the IAC
was limited to "advising the General Partner" on various issues.  (Second
Polkes Decl., Ex. 1 at 27.)  The LPA further explains that the General
Partner "in its sole discretion may present to the IAC for its review such
matters as the General Partner determines . . . ."  (Second Polkes Decl., Ex.
3 at 53-55.)  The Investment Committee, comprised of Lehman executives, had
"final approval of a proposed investment for inclusion in LBREP III."
(Second Polkes Decl., Ex. 1 at 26.)

in the LBREP III investment strategy.  The October 2007 PPM
stated that the Partnerships "will employ leverage in the
acquisition, operation, and ownership of its investments . . .
Debt may take the form of mortgage, corporate or seller
financing." (Second Polkes Decl., Ex. 1 at 19.)  The August
2007 PPM even disclosed that "the General Partner expects the
Fund leverage to be up to 65% of the market value of its
investments." (Second Polkes Decl., Ex. 2 at 19; see also Ex. 3
at 41.)  The LPA, issued prior to the first admission of limited
partners in November 2007, described the use of leverage in more
detail, including the Partnerships' ability to use leverage to
finance transactions, the 65 percent leverage threshold, and the
circumstances under which the leverage threshold could be
exceeded.  (Second Polkes Decl., Ex. 3 at 41.)  Where, as here,
the allegedly omitted statements were actually disclosed, the §
10(b) claim fails.  Debora v. WPP Group PLC, 1994 WL 177291 at
*5 (S.D.N.Y., 1994); see also In re Progress Energy, Inc., 371
F.Supp.2d 548, 552 (S.D.N.Y. 2005).

**e.    Failure to Disclose Additional Acquisition Costs**

        Plaintiffs also allege that Defendants omitted material
information in failing to disclose additional costs of
acquisition passed on to LBREP III investors, above the
"acquisition cost" paid by Lehman and charged to the

Partnerships upon transfer of the warehoused properties.  While
the complaint alleges one type of additional acquisition cost,
the opposition brief advances an entirely different theory.

### $157 Million in Undisclosed Costs

In the Second Amended Complaint, Plaintiffs contend that
Defendant Lehman Brothers Holdings and its investment committee
agreed to $157 million in additional, undisclosed costs related
to the investment properties.  These costs exceeded the
"acquisition cost," or amount paid by Lehman to acquire the
property.

Plaintiffs allege that these undisclosed costs were paid by
Lehman and then passed on to the Partnerships.  Such facts were
material because with these additional costs, "the total
investment exceeded even that 9% carrying cost by more than $110
million," resulting in a higher payment to Lehman than agreed
upon in the LPA.  (Compl. ¶ 84.)  Plaintiffs offer specific
allegations in the Second Amended Complaint of each overpayment,
noting the difference between the "acquisition price" and the
price of transfer to LBREP III on a specified transfer date.
(Compl. ¶¶ 86-87.)  The chart in paragraph 87 of the Second
Amended Complaint purports to document these additional costs,
alleging $157.1 million total "excess over disclose price."
(Compl. ¶ 87.)

Defendants point out that the figures used by Plaintiffs to argue that Plaintiffs incurred the $157 million "overcharge" are misleading.  Defendants assert that Plaintiffs essentially "conflate[d] the acquisition cost of the properties paid to Lehman [by the Partnerships] with the incremental investments that were used to finance the ongoing development and maintenance of the properties" after the transfer to the Partnerships.  (Def. Reply Br. at 12.)

The Court agrees.  Plaintiffs calculated this $157 million discrepancy using incorrect data regarding the costs paid by LBREP III for the warehoused properties.  Rather than use the "Investments at Cost" data provided in the LBREP III September 30, 2008 statements, Plaintiffs used the Transaction Summaries also published on that date.  These summaries do not document the acquisition costs of the properties, but the total LBREP III commitment, including acquisition cost and unfunded commitments.

Plaintiffs as much as acknowledge this error, as they fail to argue the overpayment theory in their opposition papers.  Instead, they argue that "the SAC does not contend that the approximately $157 million was anything other than a *commitment* that Lehman made prior to acquisition."  (Pl. Br. at 26, emphasis in original.)   Plaintiffs thus drop the theory of undisclosed costs pled in the Second Amended Complaint and adopt

the theory that Defendants knowingly failed to disclose
"unfunded commitments" to make future investments in the
warehoused properties.

### $156 Million in Unfunded Commitments

Thus, Plaintiffs allege in their opposition brief that
Defendants actually agreed to $156 million of "unfunded
commitments" to invest further in some of the warehoused
properties.  "Unfunded commitments" are "forward commitments
made to finance the ongoing development and maintenance of the
properties."  (Def. Reply Br. at 13.)  For instance, in addition
to the $40 million acquisition cost paid for a property at West
44th St, the Partnerships were also obligated to make additional
investments, or as yet "unfunded commitments," to develop the
vacant lot into a hotel, as described in Supplement One to the
PPM.  (Def. Reply Br. at 13.)

Plaintiffs argue that it was these binding commitments that
were not disclosed to investors in Supplement One.  Plaintiffs
also explain that upon transfer of the properties in May 2008,
the Partnerships assumed these future payment obligations.
Plaintiffs contend that Defendants knew of these additional
commitments and failed to disclose them to investors until
almost a year after the date of the first closing. (Pl. Br. at
15.)

Defendants contend first that this theory should be dismissed as it was not plead in the Second Amended Complaint, but was raised for the first time in Plaintiffs' opposition brief. Secondly, they argue that the PPMs and LPA repeatedly disclosed that additional investments in LBREP III properties could and would be made after the initial acquisition costs were paid.

Defendants are correct that the Plaintiffs may not amend their complaint in their legal briefs. The Court will nonetheless analyze these factual allegations to consider whether granting Plaintiff leave to amend would be futile.

The Court finds that Plaintiffs have not alleged facts to support the claim that Defendants made material omissions regarding these unfunded commitments, and thus any amendment of the pleadings would be futile. Prospective investors were advised that the General Partner had considerable discretion regarding investment decisions. For instance, in Section 2.4 of the LPA, under the "Purpose and Powers" section, the General Partner is empowered to:

> subsequent to the Partnerships' initial investment in
> any Portfolio Investment, make additional investments
> in such Portfolio Investments (including additional
> investments made to finance acquisitions by any
> Portfolio Company or any capital improvements, tenant
> improvements, or other improvements or alterations to
> any property constituting a Portfolio Investment or
> otherwise to protect the Partnership's investment in

29

> any Portfolio Investment or to provide working capital
> for any Portfolio Investment.

(Second Polkes Decl., Ex. 3 at 17.)  Moreover, the detailed

descriptions of prospective investment properties listed in

Supplement One frequently discussed in detail ongoing and future

plans for development and construction, often in partnership

with other commercial real estate companies.  These plans should

have further alerted a prospective investor of the likelihood of

additional investments in the warehoused properties.  (See Reply

Br. at 13 n. 11.)  The unfunded commitments were obligations by

LBREP III to make ongoing investments in the properties, as

specifically disclosed and authorized in the LPA.  As such,

these investment decisions were well within the discretion of

the General Partner to approve and do not constitute a knowing,

material omission under Section 10(b) or Rule 10b-5.[7]

In addition, Plaintiffs' charts again make repeated,

careless mistakes in characterizing the allegedly omitted

unfunded commitments, often overstating the allegedly

undisclosed amount.  While in some instances LBREP III did agree

to make further investments in properties above the price

---

[7] The Court also rejects the Plaintiffs' attempt to conflate the two arguments
in the opposition papers by relying on the similarity of the two figures,
referring to the $156 million of unfunded commitments as a "near-$157 million
discrepancy."  They go so far as to describe the table on page 16 of their
opposition brief documenting unfunded commitments as a "summary" of the table
included at paragraph 87 of the complaint.  These tables document entirely
different calculations, and contain virtually none of the same information.

disclosed in Supplement One, in other cases Defendants merely
paid their originally disclosed commitment over time.[8]  These
errors further support the finding that Plaintiffs have not
alleged facts to support their claims that Defendants made
material omissions regarding undisclosed costs or commitments
for future payments incurred by Lehman and passed on to the
Partnerships.

In sum, the Court finds that Plaintiffs have failed to
sufficiently plead any claim for securities fraud under section
10(b) of the 1934 Act and Rule 10b-5.  As there is no adequately
pled underlying violation of the Act, Plaintiffs claim for
rescission under Section 29(b) also fails.

**2.   Section 20 Claims against Individual Defendants**

Count three of the SAC alleges that the ten individual
defendants are separately liable as control persons under
Section 20(a) of the 1934 Securities Exchange Act.  One of the
requirements to establish a violation of § 20(a) is a primary
violation of the Act.  ECA, Local 134 IBEW Joint Pension Trust
v. JP Morgan Chase Co., 553 F.3d 187, 207 (2d Cir. 2009).  As
this Court has found that Plaintiffs have failed to state a
claim under Section 10(b), Plaintiffs claims against individual
defendants under Section 20(a) also fail.

---

[8] These properties include the Aldi Senior Housing investment, the Atemi
France investment, the West 44th Street investment, and the Bangkok Serviced
Apartment Portfolio.

31

3.    **State Law Claims & Supplemental Jurisdiction**

As all of Plaintiffs' federal claims have been dismissed and there is no complete diversity between the parties, this Court declines to exercise supplemental jurisdiction over the remaining state law causes of action.  28 U.S.C. § 1367(c)(3).

CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED with regard to the claims under Section 10(b), Section 29(b) and Section 20(a) of the 1934 Securities Exchange Act. The Court declines to exercise supplemental jurisdiction over the remaining state claims.  The Clerk of the Court is directed to terminate the pending motion to dismiss (ECF Docket Number 57) and close both pending cases.

SO ORDERED:

_____
BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          March 28 , 2011